## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WILLIAM H. "Chip" JONES, II, on behalf of himself and all others similarly situated;<br><br>**Plaintiff,**<br><br>vs.<br><br>ZANDER GROUP HOLDINGS, et al.,<br><br>**Defendants.** | **8:24CV428**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Plaintiff's motions to quash a subpoena for documents (Filing No. 1) and deposition subpoenas (Filing No. 20) directed to Plaintiff's former attorneys, Peter Langdon and Joan Cannon, and their law firm of McGrath North Mullin & Kratz, PC LLO ("McGrath"). The subpoenas were issued by Defendants, Zander Group Holdings, et al., in connection with Plaintiff's lawsuit pending against the defendants in the Middle District of Tennessee, *Jones v. Zander Group Holdings, Inc. et al*, 3:23-cv-00687 (M.D. Tenn. July 12, 2023). The Court held oral argument on the motions on April 18, 2025, (Filing Nos. 39-40), and the matter is fully submitted.

### BACKGROUND

Plaintiff initiated the underlying class action lawsuit against the defendants in the Middle District of Tennessee on July 12, 2023, arising out of their alleged "malfeasance" regarding Plaintiff's rights under two deferred-compensation plans under the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. Plaintiff alleges the following facts in his Second Amended Class Action Complaint,[1] which is the current operative pleading.

Plaintiff, a resident of Tennessee, worked as the IT manager on behalf of Defendant Zander Insurance Agency (the "Agency") from June 2010 to October 2014. The Agency is a partnership owned by two trusts, one of which held 100% of the shares of Defendant Zander Group Holdings, Inc. (the "Holding Company"), which in turn was created for the purpose of establishing the

---

[1] Neither party provided this Court with relevant pleadings from the pending action in the Middle District of Tennessee; however, this Court has sua sponte reviewed and taken judicial notice of the docket and filings in the underlying case. See *United States v. Evans*, 690 F.3d 940, 943 (8th Cir. 2012) (quoting *Conforti v. United States*, 74 F.3d 838, 840 (8th Cir. 1996) ("We have held that federal courts may sua sponte take judicial notice of proceedings in other courts if they relate directly to the matters at issue.") (internal quotation marks and citation omitted)).

Zander Group Holdings, Inc. Employee Stock Ownership Plan (the "ESOP").  Defendant, Jeffrey J. Zander ("Mr. Zander"), was the president of the Holding Company, and the trustee and beneficiary of the two trusts.  Defendant, Joshua Vollet ("Mr. Vollet"), was the Executive Vice President of the Holding Company and oversaw the ESOP.  During Plaintiff's employment, he became a member of his employers' 401(k) Plan on January 1, 2011, and joined the ESOP on September 1, 2011.

Plaintiff resigned from his employment in October 2014.  In 2016, Plaintiff rolled his funds from the 401(k) Plan into another qualified ERISA retirement plan.  Plaintiff "assumed at this time his account within the 401(k) Plan was fully closed."  Plaintiff maintains that, under the ESOP, his awarded shares of Company stock were held in a trust account maintained by the ESOP to be paid out once Plaintiff reached an age eligible to draw the funds without penalty, and that 80% of his ESOP shares became vested as a result of his four years of qualifying service.

Plaintiff alleges that in November 2021, Mr. Zander, Mr. Vollet, and the other individual defendants "decided to push out" ESOP members that were not current employees through an ESOP stock repurchase. Mr. Vollet sent Plaintiff a letter on November 12, 2021, stating:

> The Zander Group Holdings Board of Directors has approved an ESOP stock repurchase for terminated ESOP participants. You are eligible to participate in this repurchase. You have 30 days from the date of this notice to consider accepting this offer. If accepted, you will get a 100% immediate payout of the vested balance to redeem all of your ESOP stock. If the offer is not accepted during the 30-day period, the offer will terminate.

> Enclosed, you will find the documentation required to complete this transaction including vested balance, distribution, and tax withholding information. . . . If you choose to accept the offer, please return the signed original set of distribution forms before December 15th, 2021 to ensure the processing. . . .

(Filing No. 2-1 at p. 1).  Because Plaintiff did not want to accept the ESOP stock repurchase offer, he did not return the enclosed documentation to complete the transaction.  Plaintiff alleges that, unbeknownst to him, the ESOP stock repurchase "offer" was not actually an offer, but was instead compulsory.  Plaintiff also alleges the documents enclosed in Mr. Vollet's letter contained different terms than those presented in the text of Mr. Vollet's letter.

On December 13, 2021, Mr. Vollet sent Plaintiff an email noting Plaintiff had not returned the paperwork indicating his preferences for the stock repurchase.  Plaintiff responded the same day stating, "I'm not selling. I'm keeping the funds with you guys."  On December 16, 2021, Mr.

2

Vollet responded, cc-ing Chief Legal Officer David Lewis ("Mr. Lewis"), identifying three options available to terminated ESOP participants, and "[r]emaining a participant in the ESOP is not an option."

On December 17, 2021, Peter Langdon, an attorney at McGrath North retained by Plaintiff, wrote to Mr. Vollet and Mr. Lewis, reiterating that Plaintiff did not want to sell his ESOP stock and requested a copy of "[the ESOP] Plan document including all amendments and any documents regarding the reshuffling procedures." The plan documents were not provided. On January 14, 2022, Plaintiff received a "Transaction Confirmation" dated January 1, 2022, indicating that $781,879.76 had been transferred or rolled over to the 401(k) Plan on December 31, 2021. Plaintiff alleges that under the terms of the ESOP, the Administrator was not authorized to roll over Plaintiff's funds without his written election and without a safe harbor notice containing specific language at least 30-days prior to the rollover.

Plaintiff's Second Amended Complaint contains claims against the defendants for (1) "Lack of Notice" in violation of § 204(h) of ERISA; (2) breach of fiduciary duty in violation of § 502(a) of ERISA; (3) ERISA Plan document penalty for failure to furnish documents and information required under the ESOP and ERISA at Plaintiff's request; (4) interference with Plaintiff's rights under ERISA in violation of 29 U.S.C. § 1140; and (5) ERISA equitable and injunctive relief; or in the alternative, (6) breach of the ESOP contract; and (7) unjust enrichment. Plaintiff seeks to represent a class of "All ESOP Participants whose accounts were rolled over on around December 31, 2021 in violation of the ESOP's terms and ERISA protections." (See Filing No. 43 in *Jones*, 3:23-cv-00687).

The defendants have filed a motion to dismiss Plaintiff's claims for several reasons, arguing that "[a]t its core, Plaintiff's lawsuit is founded on his wish that the terms of his retirement plan had been different so he could stay invested in the stock of a highly successful privately-held company he no longer works for." Defendants initially argue Plaintiff lacks Article III standing because he "was the intervening cause of his own alleged injury." Defendants claim that "Plaintiff was informed, on two separate occasions, that he would be cashed out of the ESOP, and he was offered the opportunity to direct his ESOP proceeds somewhere other than the 401(k) Plan if he so chose," but he "did nothing." Even if he established standing, Defendants contend Plaintiff's claims all must fail because "the terms of the Plan are clear: former employees have no right to remain invested in company stock," and Plaintiff "cites to sections of ERISA that do not apply to

the Plan . . , misreads statutory provisions to fashion claims that stretch ERISA beyond its bounds, and advances state law claims that are preempted by ERISA." (See Filing No. 49 in *Jones*, 3:23-cv-00687).

The parties have engaged in written discovery while Defendants' motion to dismiss remains pending. In discovery, Plaintiff "provided some documents and information regarding McGrath for which attorney-client privilege had been waived" because Plaintiff had previously shared those communications with third parties. (Filing No. 2 at p. 2). Specifically, in December 2015, Plaintiff forwarded two emails from McGrath North attorney, Joan Cannon, to his former colleague, Lon Cherry, about "the offer [Plaintiff] received from Zander Group Holdings to take a cashout (distribution) of your vested account balance from the ESOP." Ms. Cannon advised in part, "This cash-out offer is optional. It is not mandatory and they cannot cash-out you out without your consent. Your account will stay in the ESOP until you elect a cash-out (distribution)." (Filing No. 2-4 at p. 8). Plaintiff responded to Ms. Cannon, "I'm lead to believe that the 'company' may convert my existing stock to cash and thus if they do so, I will not take part in any stock rise or fall[.]" Ms. Cannon replied she did "not know for sure, but I think that if they convert your stock to cash, they will allow you to roll over the cash to an IRA," which would likely not occur the current year, but possibly next year, so "you may want to roll your account into an IRA." (Filing No. 2-4 at pp. 7-8).

Plaintiff also produced one communication from his former attorney, Mr. Langdon, which Plaintiff previously had disclosed to the Department of Labor ("DOL") in February 2022. Plaintiff emailed an employee at the DOL regarding his concerns that Zander "breached US regulatory requirements by unlawfully using my ID to create a financial account and assign my funds to assets without my knowledge or acceptance." Attached to that email was a January 14, 2022, email from Mr. Langdon to Plaintiff in which Mr. Langdon states, "The ESOP document allows Zander to take you out of the Company Stock investment," although the "transfer to the 401(k) Plan is a little questionable." (Filing No. 2-5 at p. 11). The DOL apparently did not commence an investigation. (Filing No. 2-3 at p. 1).

Defendants also served Plaintiff with interrogatories to inquire about the basis of his belief for his positions in his Second Amended Complaint. Defendants' Interrogatory No. 1 asked, "After receiving Mr. Vollet's December 16, 2021 email as referenced in Paragraph 73 of the Complaint . . . did you nonetheless believe that your assets would remain in the ESOP if you took

no further action? If so, state all facts that led you to that belief." Plaintiff answered in part that he "understood assets would remain in the ESOP based on prior legal advice." Defendants' Interrogatory No. 2, asked Plaintiff, "After Peter Langdon sent his December 17, 2021 letter to Mr. Vollet and Mr. Lewis requesting documents as referenced in Paragraph 74 of the Complaint, did you believe that your assets would remain in the ESOP if you took no further action? If so, state all facts that led you to that belief." Plaintiff answered, in part, "Yes. Plaintiff understood assets would remain in the ESOP based on prior legal advice." (Filing No. 30-3 at p. 2). Additionally, during Plaintiff's deposition, defense counsel asked, "[I]n December, 16, 2021, . . . you didn't believe that you could keep your ESOP funds in the ESOP at this point; correct?" Plaintiff answered, "I did." When asked why, Plaintiff answered, "Based on the guidance I was given from Joan Cannon, and I did read it elsewhere later on, that consent is required." (Filing No. 30-4 at p. 6).

Defendants have now issued subpoenas to McGrath North and Ms. Cannon and Mr. Langdon. The Document Subpoena to McGrath North requests the following documents:

> 1. All documents and communications relating to the work you performed for Mr. Jones related to Zander (including the Zander ESOP and the Zander 401(k) Plan), including all engagement agreements under which you performed any such work.
> 2. All communications between you and Mr. Jones relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.
> 3. All documents and communications relating to meetings between you and Mr. Jones related to Zander, including the Zander ESOP and the Zander 401(k) Plan.
> 4. All documents and communications provided to you relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.
> 5. All documents and communications relating to your opinions and advice related to Zander (including the Zander ESOP and the Zander 401(k) Plan), including all documents relied upon by you in rendering such opinions and advice.

(Filing No. 2-2). Defendants' Deposition Subpoena to McGrath North identifies the following topics for examination:

> 1. The work you performed for Mr. Jones relating to Zander (including the Zander ESOP and the Zander 401(k) Plan), including all engagements under which you performed such work.
> 2. Your documents, records, and files relating to your representation of Mr. Jones.
> 3. Communications between you and Mr. Jones relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.
> 4. Meetings between you and Mr. Jones relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.

5. The information and documents provided to you relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.

6. Your opinions and advice to Mr. Jones relating to Zander, including the Zander ESOP and the Zander 401(k) Plan, and your basis for all such opinions and advice.

7. The documents and information relied upon by you in providing Mr. Jones opinions or advice relating to Zander, including the Zander ESOP and the Zander 401(k) Plan.

(Filing No. 20-1 at pp. 9-10).

Plaintiff has filed the instant motions to quash the subpoenas, arguing they seek irrelevant information protected by the work-product and/or attorney client privileges.  (Filing No. 2 at pp. 2-3).  Defendants argue Plaintiff waived the attorney-client privilege and any work product protection with respect to the legal advice he received from McGrath North by (i) voluntarily disclosing McGrath North's legal advice to third parties and (ii) by relying on that advice in the underlying litigation.  (Filing No. 30 at p. 1).

## ANALYSIS

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering a variety of factors. Fed. R. Civ. P. 26(b)(1).  Rule 45 of the Federal Rules of Civil Procedure allows a party to serve a subpoena for the production of documents and for testimony upon a nonparty.  Fed. R. Civ. P. 45.  The scope of discovery allowed under Rule 45 is the same as that of Rule 26.  See Advisory Committee Notes regarding 1991 Amendments to Rule 45(a)(2) (stating a "nonparty witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34.").  Under Rule 45, "the court for the district where compliance is required must quash or modify a subpoena" if it "requires disclosure of privileged or other protected matter, if no exception or waiver applies."  Fed. R. Civ. P. 45(d)(3)(A)(iii). Additionally, the court "must limit" proposed discovery outside the scope permitted by Rule 26(b)(1).  See Fed. R. Civ. P. 26(b)(2)(C).  Because McGrath North is a law firm located in Omaha, Nebraska, the motions to quash subpoenas directed to the firm were filed in this court.

As an initial matter, the Court agrees with Plaintiff that Defendants have not demonstrated that the information and documents sought from McGrath North are relevant.  (Filing No. 2 at p. 3).  Although the scope of discovery is extremely broad, courts should not "allow fishing expeditions in discovery."  See *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).

"Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Id.*

After reviewing the claims and allegations in Plaintiff's Second Amended Complaint, the Court is unconvinced that the substance of the limited engagement and legal advice Plaintiff received from Ms. Cannon in 2015 and Mr. Langdon in 2021 is relevant to the underlying lawsuit. Plaintiff alleges the actions Defendants took in November 2021 and December 2021—pushing Plaintiff and other former employees out of their stock investments through an ESOP stock repurchase, providing statutorily inadequate or improper notice, failing to provide requested Plan documents, and rolling over funds in the 401(k) Plan without written election—violated the terms and plain language of the ESOP and ERISA. Whatever Plaintiff believed his options were, and why he believed what he believed, are irrelevant to whether Defendants' actions violated the terms of the ESOP, ERISA or any other law. As Defendants themselves argue: "the terms of the Plan are clear: former employees have no right to remain invested in company stock," and Plaintiff's complaint "cites to sections of ERISA that do not apply to the Plan . . , misreads statutory provisions to fashion claims that stretch ERISA beyond its bounds, and advances state law claims that are preempted by ERISA." If the terms of the Plan and ERISA provisions are clear, then Plaintiff's beliefs about the legality of Defendants' conduct based upon his attorneys' advice is no more relevant in this case than it would be in any lawsuit. Moreover, Ms. Cannon provided advice to Plaintiff in December 2015—6 years before Defendants' alleged "malfeasance" at issue in the Second Amended Complaint. The Court remains unconvinced that the legal advice Plaintiff received from Ms. Cannon or Mr. Langdon is relevant to Plaintiff's claims against Defendants.

Defendants argue they have made McGrath North's legal advice to Plaintiff relevant by asserting Plaintiff lacks Article III standing. Specifically, Defendants assert Plaintiff caused his own injury by failing to take any alternative actions to prevent his ESOP assets from being rolled over to the 401(k) Plan by default or to avoid losses following the rollover. (Filing No. 30 at p. 11). Defendants therefore assert, "Whether Plaintiff's belief and actions were reasonable goes directly to the heart of standing and requires an analysis of exactly what that legal advice was on which he purports to have relied." *Id.*

The Court is also not convinced that Defendants' standing argument renders McGrath North's legal advice to Plaintiff relevant. In Plaintiff's brief opposing Defendants' motion to

7

dismiss, Plaintiff does not assert he relied on or otherwise mention he received legal advice from McGrath North.  Instead, Plaintiff argues his standing is "plainly presented in the Second Amended Complaint," and that Mr. Vollet's Notice Letter "contained information that was misleading," which "in and of itself, is a violation of Plaintiff's ERISA rights."  (See Filing No. 52 in *Jones*, 3:23-cv-00687). Plaintiff continues:

> When Plaintiff was told he could not take the course of action he was offered in the Vollet Notice Letter, he attempted to challenge this conduct. As a result of only learning that his funds would be rolled over on December 16, 2021, and additionally operating under the mistaken belief he was engaged in an active protest of that pending action, Plaintiff did not prepare for his ESOP stock to be liquidated and rolled over into his derelict 401(k) Plan account, and he lost a significant amount of money. On top of this, his ESOP account was closed against his will and against the terms of the Plan and ERISA. These are real harms that were clearly traceable to Defendants' complained-of conduct.

(See Filing No. 52 at p. 8 in *Jones*, 3:23-cv-00687).  Thus, McGrath North's legal advice to Plaintiff is not relevant to whether Plaintiff has demonstrated Article III standing.

Even if the Court were to find McGrath North's legal advice to Plaintiff is tangentially relevant to the underlying litigation, the Court finds it remains protected by the attorney-client and work-product privileges.  Federal common law governs privilege issues where, as here, jurisdiction is based on federal law (ERISA).  See *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985) ("Because the plaintiffs have sued the defendants for a violation of federal law, the federal law of privilege" applied to the issue of whether the defendants had waived attorney-client privilege); see also Fed. R. Evid. 501 (providing, "The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege[.]").  "The attorney-client privilege protects confidential communications between a client and his attorney made for the purpose of facilitating the rendering of legal services to the client."  *United States v. Spencer*, 700 F.3d 317, 320 (8th Cir. 2012) (citing *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984)).  For the attorney-client privilege to apply, "the parties to the communication in question must bear the relationship of attorney and client," and "the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity." *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1978) (en banc).

8

As to the work-product doctrine, Rule 26(b)(3) allows a party to discover materials "prepared in anticipation of litigation" only upon a showing that the requesting party has a substantial need for the material and cannot obtain the material or its equivalent elsewhere without incurring undue hardship. See Fed. R. Civ. P. 26(b)(3)(A)(ii). The work-product doctrine prevents "unwarranted inquiries into the files and mental impressions of an attorney" and "recognizes that it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusions by opposing parties and their counsel." *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir. 1987). The party seeking to overcome the work-product protection bears the burden of establishing substantial need and undue burden. See *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000).

The parties do not dispute that the information, documents, and testimony Defendants seek from McGrath North would ordinarily be protected by the attorney-client and/or work product privileges. Instead, Defendants assert Plaintiff has entirely waived these privileges by previously disclosing to third parties certain emails from Ms. Cannon and Mr. Langdon, and by placing their advice "at issue" in the underlying litigation.

"The attorney client privilege cannot be used as both a shield and a sword," and a party cannot claim it relied on counsel's advice without permitting the opposing party to explore the substance of that advice. *United States v. Workman*, 138 F.3d 1261, 1263-64 (8th Cir. 1998). "Voluntary disclosure of attorney client communications expressly waives the privilege," and such waiver "covers any information directly related to that which was actually disclosed." *Id.* at 1263. "When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter." *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982). However, what constitutes the "same subject matter" is narrowly construed. See *Davis v. Hugo Enterprises*, No. 8:11CV221, 2013 WL 636009, at *2 (D. Neb. Feb. 20, 2013). "Fairness is an important and fundamental consideration in assessing the issue of whether there has been a waiver of the lawyer-client privilege." *Broom, Clarkson, Lanphier & Yamamoto v. Kountze*, No. 8:14CV206, 2015 WL 7302226, at *7 (D. Neb. Nov. 18, 2015). If an intentional disclosure of attorney-client or work-product privileged information or communications is made, the protection is waived as to other undisclosed communications or information only if "(1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together." Fed. R. Evid. 502(a). "The key to a finding of implied waiver . . . is some showing by the party arguing for a waiver that the opposing party 'relies' on the privileged communication" to prove a claim or defense. *Spanel v. Cent. Cmty. Coll.*, No. 8:18CV380, 2021 WL 5907930, at *3 (D. Neb. Dec. 14, 2021). The Advisory Committee Notes to subsection (a) of Rule 502 explains:

> The rule provides that a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. See, e.g., *In re United Mine Workers of America Employee Benefit Plans Litig.*, 159 F.R.D. 307, 312 (D.D.C. 1994) (waiver of work product limited to materials actually disclosed, because the party did not deliberately disclose documents in an attempt to gain a tactical advantage). Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner. It follows that an inadvertent disclosure of protected information can never result in a subject matter waiver. See Rule 502(b). The rule rejects the result in *In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989), which held that inadvertent disclosure of documents during discovery automatically constituted a subject matter waiver.
>
> The language concerning subject matter waiver—"ought in fairness"—is taken from Rule 106, because the animating principle is the same. Under both Rules, a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.
>
> To assure protection and predictability, the rule provides that if a disclosure is made at the federal level, the federal rule on subject matter waiver governs subsequent state court determinations on the scope of the waiver by that disclosure.

Fed. R. Evid. 502(a), Advisory Committee Notes.

The Court agrees with Plaintiff that this is not a situation where he has placed his outside legal advice "at issue" in the underlying lawsuit. Plaintiff disclosed Ms. Cannon's emails to one of his former colleagues in 2015, and disclosed one of Mr. Langdon's emails to the DOL in 2022. Those disclosures certainly waived Plaintiff's claims of privilege as to those emails themselves. However, those disclosures were not made in this litigation, and there is nothing to suggest Plaintiff is actually relying on any of the advice he received to advance his claims. Plaintiff's lawsuit challenges the legality of Defendants' conduct, while Defendants maintain their conduct was

lawful under the terms of the ESOP and ERISA.  Plaintiff is not relying on his attorneys' advice as an element of any of his claims.

Defendants claim Plaintiff has put his attorneys' advice "at issue" because in response to Defendants' interrogatories and deposition questioning asking Plaintiff why he believed he could keep his ESOP funds in the ESOP in December 2021, Plaintiff replied he relied on "prior legal advice."  Essentially, Defendants seek to inject an issue into litigation—contending Plaintiff's harms were "self-inflicted"—and then demand Plaintiff disclose the advice of attorneys he consulted in to force Plaintiff to defend against Defendants' assertion.  This is inadequate to justify a complete subject matter waiver of attorney-client and work product privileges.  See, e.g., *Benson v. City of Lincoln*, 343 F.R.D. 595, 612 (D. Neb. 2023) ("[C]ourts have recognized that a party must go beyond mere denial of an opposing party's allegations and assert an affirmative defense or at least affirmatively inject a new factual or legal issue into the case to waive attorney-client privilege."); *Thomas v. Marshall Pub. Sch.*, 690 F. Supp. 3d 941, 957 (D. Minn. 2023) ("[A] court should find subject-matter waiver only in situations where the privilege holder seeks to use the disclosed privileged material for a tactical advantage in the litigation, but invokes the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials."). Because Defendants have not demonstrated the documents sought from McGrath North are relevant or that any documents sought are non-privileged, the document subpoena directed to the firm is properly quashed.

For similar reasons, Plaintiff also moves to quash the deposition subpoena directed to McGrath North and his former attorneys.  "[F]ederal courts have disfavored the practice of taking the deposition of a party's attorney" and have made clear that "the practice should be employed only in limited circumstances." *Desert Orchid Partners, LLC v. Transaction System Architects, Inc.*, 237 F.R.D. 215, 218 (D. Neb. 2006). (quotation omitted).  The Eighth Circuit has established a three-prong test for when a party may depose opposing counsel: "(1) no other means exist to obtain the information than to depose opposing counsel . . .; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).  Where opposing counsel has served as legal counsel regarding matters at issue in the pending litigation, *Shelton* properly applies.  See *Smith-Bunge v. Wisconsin Cent., Ltd.*, 946 F.3d 420, 422-23 (8th Cir. 2019) (finding *Shelton* applied to the plaintiff's request to depose in-house defense counsel about her conversations with

other employees and whether the plaintiff's employment record caused his termination); *Newkirk v. ConAgra Foods, Inc.*, No. 8:10CV22LSCFG3, 2010 WL 2135263, at \*5 (D. Neb. May 27, 2010) (rejecting the plaintiffs' argument that *Shelton* did not apply because the attorney sought to be deposed were not the defendant's "trial" attorneys; "The principles announced in *Shelton* were not limited to 'trial' attorneys[.]").

The Court finds that *Shelton* applies to Defendants' request to take depositions of McGrath North attorneys. Both attorneys were utilized to provide legal advice to Plaintiff regarding the ESOP and/or Defendants' conduct at issue in the ongoing litigation. Therefore, Defendants must show "(1) no other means exist to obtain the information than to depose opposing counsel . . .; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton*, 805 F.2d at 1327. Defendants have not made that showing. As discussed above, the limited work and legal advice provided to Plaintiff by the McGrath North attorneys has little to no relevance to the underlying litigation. Moreover, to the extent the firm has any marginally relevant information, such information is privileged and is not "crucial" to the underlying case. Accordingly, the deposition subpoenas directed to McGrath North and its attorneys are properly quashed. See Fed. R. Civ. P. 45(d)(3)(A) (requiring a court to quash a subpoena if it requires "disclosure of privileged or other protected matter[.]"). Upon consideration,

**IT IS ORDERED:**

1. Plaintiff's Motion to Quash Subpoena for Documents (Filing No. 1) is granted.
2. Plaintiff's Motion to Quash Deposition Subpoena (Filing No. 20) is granted.

Dated this 27th day of May 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

12